**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| THERON DAVIS, )<br><br>Petitioner, )<br><br>v. )<br><br>DAVID SEXTON, Warden )<br><br>Respondent. ) | No. 2:13-cv-02031-STA-cgc |

**ORDER DIRECTING CLERK TO MODIFY THE DOCKET,**
**ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2254,**
**DENYING CERTIFICATE OF APPEALABILITY,**
**CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH,**
**AND**
**DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition") filed by *pro se* Petitioner Theron Davis ("Davis"), Tennessee Department of Correction number 340132, an inmate at the Northeast Correctional Complex ("NECX") in Mountain City, Tennessee. (§ 2254 Pet., ECF No. 1.) For the reasons stated below, the Court DENIES the § 2254 Petition.

## BACKGROUND

### I. State Court Procedural History

On July 27, 2000, a grand jury in Shelby County, Tennessee, returned a two-count indictment against Theron Davis and his co-defendant Herman Spencer. (Indictment, *State v. Davis*, No. 00-08557 (Shelby Cnty. Crim. Ct.), Page ID 81, 83, ECF No. 11-1.) Count 1 charged Davis and Spencer with especially aggravated robbery in violation of Tenn. Code Ann.

§ 39-13-403. (*Id.*) Count 2 charged Davis and Spencer with criminal attempt: murder first degree in violation of Tenn. Code Ann. § 39-12-101. (*Id.* at Page ID 83.) On October 2, 2000, Davis pled not guilty to the charges in the Shelby County Criminal Court.[1] (*Id.* at Page ID 86.)

Davis through counsel[2] filed a number of pretrial motions. On October 18, 2000, Davis filed a motion for a bill of particulars and a motion to suppress the evidence seized during his arrest. (*Id.* at Page ID 88, 96-97.) On July 16, 2001, Davis filed an amended motion to suppress, arguing for the suppression of (1) "any testimony of the alleged victim, Gary Smallwood, identifying the defendant as the perpetrator of this offense"; (2) "any and all evidence . . . which was derived from the identification of the defendant by Gary Smallwood," and (3) Davis's custodial statement to police from January 4, 2000. (*Id.* at Page ID 114.) The trial court held a motion hearing on October 4, 2001, and denied the motion by order dated November 7, 2001. (*Id.* at Page ID 99-100). Davis also filed a motion to suppress on October 9, 2001, challenging the voluntariness of his confession to the Memphis Police Department. (*Id.* at Page ID 137.) Following a motion hearing on October 15, 2001, the trial court denied the motion to suppress the confession on November 7, 2001. (*Id.* at Page ID 141-42).

A jury trial commenced October 16, 2001. (Jury Verdict, *id.* at Page ID 145.) The jury found Davis guilty of count 1, the especially aggravated robbery charge, on October 18, 2001, and

---

[1] The Arraignment states that Davis pled guilty to the charges in the indictment. (*See* Arraignment, *id.* at Page ID 86.) However, this seems to be a typographical error, since a jury trial commenced in October 2001. (*See* Jury Verdict, *id.* at Page ID 144-48.) Additionally, the October 16, 2001 Jury Verdict form states "[t]hereupon the defendant on being arraigned at the bar of the Court and charged on the bill of indictment plead NOT GUILTY to same and for his trial put himself upon the County and the Attorney General doth the like." (*Id.* at Page ID 145.)

[2] Davis was represented by counsel William D. Massey and Lorna S. McClusky at trial and on direct appeal. (*See* Arraignment, *id.* at Page ID 86; see also Not. of Appeal, *id.* at Page ID 160.)

2

guilty of count 2, the lesser included offense of criminal attempt: murder second degree, the following day.  (*Id.* at Page ID 147-48.)   On December 7, 2011, the trial judge sentenced Davis to twenty-three (23) years imprisonment for the especially aggravated offense and twelve (12) years imprisonment for the criminal attempt: murder second degree offense, with the terms to be served consecutively.  (Sentencing Trial Tr., *id.*, Page ID 694-96, ECF No. 11-7).   The trial court entered Judgment on December 7, 2001.   (J., *id.*, Page ID 151-52, ECF No. 11-1.)   Davis, through counsel, filed a motion for new trial on December 7, 2001, and an amended motion on December 19, 2001.   (*Id.* at Page ID 153, 155-57.)   At the conclusion of the motion hearing on February 8, 2002, the trial court denied the motion.   (Mot. for New Trial Hr'g Tr., *id.* at Page ID 706-08; Order Overruling Mot. for New Trial, *id.*, Page ID 158, ECF No. 11-1.)

Davis through counsel appealed to the Tennessee Criminal Court of Appeals ("TCCA") on February 20, 2002.   (*Id.* at Page ID 160.)   Davis' appellate brief identified the following issues:

1.  Whether the trial court erred by overruling the motion to suppress the identification testimony of the victim.

2.  Whether the trial court erred by denying defendant's specially requested jury instructions.

3.  Whether the trial court committed plain error in its instructions to the jury, regarding the definition of "knowingly."

4.  Whether the trial court erred by ordering defendant's sentence be served consecutively.

(Br. of Appellant on Direct Appeal, *id.*, Page ID 722, ECF No. 11-9.)   The TCCA affirmed Davis' convictions.  *State v. Davis*, No. W2002-00446-CCA-R3-CD, 2003 WL 21339000 (Tenn. Crim. App. May 28, 2003), *appeal denied* (Tenn. Oct. 6, 2003).

In upholding Davis's conviction, the TCCA summarized the evidence introduced at trial as

follows:

The State's proof established the following facts. Shortly after 10:00 a.m. on December 28, 1999, the defendant, Theron Davis, and a codefendant, Herman Spencer, entered the Summer Avenue jewelry store of the victim, Gary Smallwood, and asked to be shown some diamond rings. After the victim retrieved the jewelry from the store safe, the defendant pointed a gun at his face and ordered him down onto the floor. The defendant then dumped the contents of a trash can on the victim's head, removed the plastic liner from the can, and began emptying jewelry from the store's display cases into the liner, while Spencer occupied himself in a similar fashion at other display cases using a liner taken from another trash can. At one point during the ten to twelve minutes the victim estimated he spent on the floor during the robbery, the defendant caught him looking at him and ordered, "Don't look at me, bitch."

The victim knew that his store's surveillance camera was broken at the time of the robbery. However, when one of the robbers asked him about the surveillance tape, he told them that he would have to show them where it was, as he could not describe its location. Ordered by the defendant to "get it," the victim stood up and began walking to a back storage room, followed by both robbers. When the victim passed through a doorway, he attempted to slam the door shut behind him, but was prevented from doing so by the robbers, who pushed together against the door. The victim explained that he feared the robbers were going to kill him:

> I was very nervous. I just-I assumed that they were going to just kill me because I didn't-I didn't have the tape. And I wasn't going to give it to them if I did have it. And I tried to close the door behind me. And they were pushing back, both of them. And they were hollering. So I-I ran to the-to the back area to get out the back door.

As the gun-wielding defendant chased the victim to the back door, the victim heard Spencer screaming, "Kill him. Kill him. Kill him." The victim reached the back exit, threw the wooden security bar up, and opened the door, but the defendant shot him in the back before he could escape. The victim testified he made it out the door, but tripped over some wooden pallets lying on the ground outside. As he struggled to get up, the defendant stood over him and shot him again in the hip. At that point, firefighters from a fire station across the street ran to the victim's assistance, and the defendant and Spencer fled the scene carrying the bags of jewelry. The victim received immediate emergency medical treatment at the scene from one of the firefighters who was also an emergency medical technician, and an ambulance arrived within minutes to transport him to the Regional Medical Center (the "Med"), where he was hospitalized for over a month,

including almost one week in the intensive care unit.   After his discharge from the hospital, he required the aid of a home health worker for an additional month.

A short time after the robbery, an anonymous "Crimestoppers" tip led police to develop the defendant and Spencer as suspects in the case.   Thereafter, Sergeant Investigator Michael Jeffrey Clark of the Memphis Police Department went to the intensive care unit of the Med and showed the victim photographic spreadsheets, from which he positively identified the defendant as the man who shot him and Spencer as his accomplice.   Because the victim was on a ventilator at the time and unable to speak, Sergeant Clark worked out a communication system whereby the victim indicated "yes" by raising one finger and "no" by raising two fingers.   Sergeant Clark, who had been promoted to lieutenant by the time of the defendant's suppression hearing, testified at both the suppression hearing and at trial that the victim pointed to the defendant's and Spencer's photographs without any hesitation, and with no prompting from him or anyone else in the room.   He acknowledged he asked the victim before showing him the photographs if he understood that he could die from his injuries, and explained he did so because he hoped that, in the event the victim did not survive, any identification the victim made would be admissible as a dying declaration.   The victim testified at trial that he had been one hundred percent confident in the identifications he made in the hospital, and he was certain "[b]eyond a shadow of a doubt" that the defendant was the man who shot him.

The defendant and Spencer were later arrested at a motel in Marshall County, Mississippi, and taken to the county jail, where the defendant gave an initial statement to Sergeant Clark denying any involvement in the robbery and offering an alibi, which, upon investigation, failed to check out.   Shortly thereafter, the defendant and Spencer waived extradition and were transported back to Tennessee.   During the trip, the defendant spontaneously began to confess his role in the robbery, and, after being informed of his rights, told the officers transporting him that he could show them the location of the jewelry.   However, when the officers drove the defendant to that location to meet investigators, no jewelry was found.   The defendant was then taken to the robbery division headquarters, where he was again advised of his rights and signed a waiver of rights form before giving a detailed, written confession to the crime.   In his confession, the defendant said he shot the victim out of panic when the victim attempted to escape, he was sorry he shot the victim, and he never intended to kill the victim.

On July 27, 2000, a Shelby County Grand Jury indicted the defendant and Spencer on one count of especially aggravated robbery and one count of criminal attempt to commit first degree murder.   The defendant's separate trial was held before a criminal court jury from October 15-18, 2001.[3]   At trial, the State

_____

[3]The record contains the defendant's motion to sever, but no order from the trial court

presented the proof which we previously have set out  The defendant testified, denying his involvement in the crimes and saying that the statement he had given confessing his role in the crimes had been coerced by police officers who not only struck him, but also told him that he would be released within six months if he made his account of the crimes match that provided by his codefendant.   He said the police officer who took his statement supplied all the words, with the exception of his expression of remorse that the victim had been shot.   The defendant insisted he had never robbed anyone and said the police fabricated and forced him to sign the statement because he was a drug dealer and lived a criminal lifestyle.   He also offered an alibi, different from the one he had given Sergeant Clark in Mississippi, which was corroborated by Jesse James Brown who testified he and the defendant had been at the defendant's house when the robbery occurred.   At the conclusion of the trial, the jury found the defendant guilty of especially aggravated robbery, a Class A felony, and criminal attempt to commit second degree murder, a Class B felony.

The only witness at the defendant's December 7, 2001, sentencing hearing was the victim, who described the intense physical and emotional pain he had suffered as a result of the incident.   He said he had undergone numerous surgeries, suffered extreme pain, and been left with extensive permanent physical scarring as a result of his injuries.   He was currently still undergoing physical therapy to increase his range of motion from his surgeries.   Although he had enjoyed a good business at the Summer Avenue location, where he had operated his jewelry store for over fifteen years, he had been unable, emotionally, to return to work at the same location after the incident and, as a consequence, had been forced to relocate his business.   The victim acknowledged his insurance company had reimbursed him for the approximately $200,000 worth of jewelry taken in the robbery, but said that because of the emotional trauma he had experienced from the incident, which left him unable to return to the Summer Avenue location, he had been without any income from his jewelry business until approximately four months before the hearing, when he had finally made the decision to relocate his store.

The trial court found the following four enhancement factors applicable to the defendant's criminal attempt to commit second degree murder conviction: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; the defendant was a leader in the commission of an offense involving two or more criminal actors; the personal injuries inflicted on the victim were particularly great; and the defendant possessed or used a firearm during the commission of the offense.   *See* Tenn. Code Ann. §

---

granting the motion.   At the sentencing hearing, the trial court made a brief reference to the defendant's pending charge for criminal attempt to commit first degree murder of another victim, involving an incident in which the defendant's codefendant had been killed.   It is unclear from the record, however, whether the trial court was referring to Spencer.]

40-35-114(1), (2), (6), (9) (Supp. 2001). The court found two enhancement factors applicable to the especially aggravated robbery conviction: the defendant's previous history of criminal convictions or criminal behavior; and the defendant was a leader in the commission of an offense involving two or more criminal actors. *See id.* § 40-35-114(1), (2). Finding no applicable mitigating factors for either offense, the trial court sentenced the defendant as a Range I, standard offender to twelve years at 30% for the criminal attempt to commit second degree murder conviction, and as a Range I, violent offender to twenty-three years at 100% for the especially aggravated robbery conviction. Based on its finding that the defendant was a dangerous offender who exhibited little or no regard for human life and no hesitation about committing a crime when the risk to human life was high, *see* Tenn. Code Ann. § 40-35-115(b)(4), the trial court ordered that the sentences be served consecutively, for an effective sentence of thirty-five years in the Department of Correction.

*State v. Davis,* 2003 WL 21339000, at *1-3.

On December 21, 2003, Davis filed a *pro se* petition for post-conviction relief in the Shelby County Criminal Court. (Pet. for Post-Conviction Relief, *Davis v. State*, Page ID 835-47, ECF No. 11-10.) Davis through counsel Paul Guibano filed three amended post-conviction petitions, raising various ineffective assistance of counsel claims and claims of trial court error. (Am. Pet. for Post-Conviction Relief, *id.* at Page ID 856-63; 2nd Am. Pet. for Post-Conviction Relief, *id.* at Page ID 866-68; 3rd Am. Pet. for Post-Conviction Relief, *id.* at Page ID 870-76.) On February 15, 2010, Davis through counsel Kamilah Turner,[4] filed his fourth amended post-conviction petition. (4th Pet. for Post-Conviction Relief, *id.* at Page ID 878-883.)

The Shelby County Criminal Court held a hearing on Davis's petition on February 17, 2010. (Pet. for Post-Conviction Relief Hr'g Tr., *id.*, ECF No. 11-11). The Tennessee Court of Criminal Appeals summarized the evidence presented at the post-conviction relief hearing as follows:

---

[4] On October 15, 2009, the Court allowed Davis to substitute Kamilah Turner for Paul Guibano as attorney of record to represent Davis in his post-conviction proceedings. (*See id.* at Page ID 854.)

7

The Petitioner testified that he was represented by Counsel and Co-counsel. The Petitioner said that Michael Robins represented him during his suppression hearing. The Petitioner said that Counsel failed to meet with him other than at court dates. The Petitioner said that when he told Counsel about alibi witnesses, Counsel "rejected it." He said Counsel "never took [him] serious." The Petitioner said that he was surprised when Michael Robins announced at the suppression hearing that there was "no factual basis for which we can raise a matter of defense." The Petitioner testified that, before trial, he provided Counsel with the name of an eyewitness to the robbery, Tavarius Jackson. The Petitioner explained that he met Jackson in jail, and the two began to discuss the Petitioner's case. Jackson told the Petitioner that he knew about the robbery because he had witnessed it and that he was willing to testify on the Petitioner's behalf. When the Petitioner informed Counsel of this witness, the Petitioner said that Counsel responded that suppression of the victim's identification was the best strategy because juries do not find jailhouse witnesses credible.

The Petitioner testified that neither Counsel nor Co-counsel discussed a defense strategy with him. Rather, they encouraged him to accept the State's offer of twenty-five years to be served at 100%. The Petitioner said that the arguments made on his behalf at the suppression hearing were never discussed with him. The Petitioner confirmed that Counsel sought to be relieved from representation before his trial. The Petitioner testified that Counsel "came in and told me if I force him to go on with this hearing and the judge make him stay on my case, I'm going to regret it. Those are his exact words." The Petitioner speculated that Counsel wanted to be relieved due to the Petitioner's failure to make full payment for Counsel's services. The trial court denied Counsel's motion to withdraw.

The Petitioner testified that Counsel was ineffective for failing to adequately raise the issue of the photographic line up. At the suppression hearing, the defense argued that the procedure was unduly suggestive because the victim was hospitalized and being treated for the gunshot wounds. The Petitioner said Counsel was ineffective for failing to argue that the photographic line up was suggestive because the Petitioner was the only one in the photographic line up wearing jewelry. The Petitioner said that, prior to the suppression hearing, his attorneys never discussed the photographic identification with him. In describing the overall communication throughout his case the Petitioner said, "[There] wasn't none," maintaining that he only saw Counsel at court appearances and Counsel and Co-counsel on the day of trial.

On cross-examination, the Petitioner agreed that the victim identified the Petitioner in the courtroom at trial. The victim also testified at trial that he had seen the Petitioner several times before the day of the robbery and shooting. The Petitioner agreed that he had been in the jewelry store before the day of the robbery and shooting.

The Petitioner testified that he decided that Counsel's performance was deficient on the day Counsel sought to withdraw, which was before the Petitioner's trial. The Petitioner said he could not remember whether he wrote letters commending Counsel on his work after his trial. The State provided the Petitioner with letters written to Counsel and Co–Counsel complimenting their work. The Petitioner identified his signature on the letters but denied that the handwriting in the body of the letters "look[ed]" like his handwriting.

The Petitioner agreed that he did not have the eyewitness to the robbery, Tavarius Jackson, in court to testify at the post-conviction hearing. The Petitioner said that he did not know Jackson's location at the time of the post-conviction hearing, and that he did not know Jackson's date of birth, address, or social security number.

Counsel testified that the Petitioner's mother retained him to represent the Petitioner. When asked whether Counsel had contact with the Petitioner during the representation, Counsel responded:

> My office had contact with [the Petitioner]. One of the things that's different at my office is we're not a group of lawyers that share expenses. We're a group of lawyers that work as a team for the firm. And so we would have different lawyers seeing [the Petitioner] at different times. For example, Mr. Robins, Mike Robins, an attorney of many years experience conducted the Motion to Suppress. He saw [the Petitioner] on occasion. Ms. McClusky did the trial primarily in this. I sat as second seat in that trial. So we . . . all worked together toward a common end so that [the Petitioner] would have stronger representation.

Counsel testified that entries on his file indicated he provided a copy of discovery to the Petitioner on January 18, 2001; he met with the Petitioner on January 29, 2001; he played the preliminary hearing tape for the Petitioner on February 6, 2001; and he met with the Petitioner's mother on April 16, 2001. Counsel said that he met with the Petitioner numerous other times as the Petitioner had indicated at trial during the *Momon* hearing. Counsel read the following portion of the transcript from the *Momon* hearing:

> Co-counsel: Now, each time we met with you we talked about possible defenses. Do you remember those meetings?
>
> Petitioner: Yes, ma'am.

Co-counsel: And we've met with you many times to talk about these things, haven't we?

Petitioner: Yes, ma'am.

Co-counsel: And you've gotten copies of what we have in the case; is that correct?

Petitioner: Yes, ma'am.

Co-counsel: The discovery, you remember getting packages from us? And when we would meet with you us handing you packages of paper?

Petitioner: Yes, ma'am.

Co-counsel: And we'd go over those things?

Petitioner: Yes, ma'am.

Co-counsel: And some of those things were statements by other persons?

Petitioner: Yes, ma'am.

Co-counsel: And some were reports by officers?

Petitioner: Yes, ma'am.

Co-counsel: And you got all that?

Petitioner: Yes, ma'am.

Co-counsel: And you've gone over all that?

Petitioner: Yes, ma'am.

Co-counsel: And so you've got all the information and we've reviewed it with you, haven't we?

Petitioner: Yes, ma'am.

Counsel testified that the Petitioner provided the name of his girlfriend, Rostin Deangelo, as an alibi witness. Counsel reviewed Deangelo's police

statement which indicated that she was with the Petitioner on the night of the robbery, but the Petitioner had taken her home at 9:00 p.m. The robbery and shooting occurred "somewhere around 10:00 p.m." so Counsel was unable to use Deangelo as an alibi witness. When Counsel discussed the problem with using Deangelo as an alibi, the Petitioner said there was a different alibi witness, "Tony," but the Petitioner did not know his full name. Shortly before the Petitioner's trial on these charges, the Petitioner's brother brought a witness, Jesse Brown, to Counsel's office. Counsel testified that, even though late, the trial court allowed Brown to testify at trial.

Counsel provided the following summary of the Petitioner's case and the evidence against him:

> This was a difficult case. In that, we not only had [the victim] identifying [the Petitioner] but we also had a confession, an alleged confession by [the Petitioner]. In addition, there was statements by his brother to police that he . . . saw Herman who was the co-defendant in this case, Herman Spencer I think his name was, and [the Petitioner] at the house right afterwards with rings on top of what appeared to be these trash can containers. . . . And that's what [the victim] said trash was emptied out of and they took the liners out of the trash cans, put the jewelry in them and after they shot him, fled the scene. So his brother said he saw that. Herman Spencer gave a statement that they participated and that [the Petitioner] was, as I recall, was the . . . shooter. . . . Mr. Jones, he was supposed to take part I believe. And he kind of chickened out or he was going to be a lookout or something and he heard shots and left, but they called him Pooky. That was his nickname. They talked [ ] about [him] being Pooky. And that—so he was involved and gave statements to the police.

Counsel explained that, based on the proof against him, he did not believe the Petitioner needed to go to trial. Counsel said that the Petitioner did not want to accept the State's offer of twenty-five years to settle this case and another felony charge against the Petitioner. Counsel said that, given the proof in the case, the only defense strategy was to attempt to discredit the victim and to provide supporting facts to show the Petitioner's statement was coerced.

Counsel testified that he did not request that possible fingerprints obtained at the scene be processed. He explained that the Petitioner's position was that he was not present so Counsel did not believe the Petitioner would benefit from such a request.

11

Jim Hill, a Memphis Police Department latent print examiner, testified that he examined fingerprint evidence from the Defendant's case. Hill testified that none of the fingerprints taken from the scene matched to the Defendant.

Co-counsel testified that she met with the Petitioner and discussed the charges and possible defense with him. Co-counsel recalled that the Petitioner's position was that he was not present during the robbery and that he had an alibi. The first alibi witness the Petitioner provided was his girlfriend, but she could not provide an alibi for the Petitioner. Next, the Petitioner offered Herman Spencer as an alibi witness. Co-counsel explained to the Petitioner that, because Spencer was a co-defendant in the case, Spencer would be a "very difficult alibi person to rely upon." The Petitioner offered the last alibi witness shortly before trial. The Petitioner told Co-counsel that "Tony" "watched his back," but the Petitioner could not provide "Tony's" last name. The Petitioner told Co-counsel that his family would try to find "Tony." The Petitioner's brother brought a witness to Co-counsel's office that she assumed would be "Tony," but it was another witness, Jesse Brown. Co-counsel said that Jesse Brown testified at the Petitioner's trial. Co-counsel testified that the Petitioner never mentioned an eyewitness to the robbery.

Co-counsel testified that she did not recall hiring an investigator for this case but that she did visit the crime scene. Co-counsel said that she met with the Petitioner in jail but could not recall how many times. Co-counsel said that the Petitioner was frustrated he had been charged, but she did not recall him being frustrated with her representation. Co-counsel said that she was aware police lifted fingerprints from the crime scene. She said she did not attempt to have the prints processed because the Petitioner admitted he had been in the jewelry store before, and she did not want to risk a fingerprint match to the Petitioner. Co-counsel agreed that, in the photographic line up, the Petitioner is the only person wearing visible jewelry. Co-counsel said that she did not request the victim's medical records.

On cross-examination, Co-counsel testified that she investigated all information given to her about different alibi witnesses. Co-counsel explained her decision not to ask the trial court to dismiss the Petitioner's cases based upon the theory that the murder charge was incidental to the robbery charge. The Petitioner referred to *State v. Anthony,* 817 S.W.2d 299 (Tenn. 1991), in support of his argument and, after reviewing the case and conducting research, Co-counsel found that the case was narrowly construed to kidnapping and some rape cases, so it would not be applicable in the Petitioner's case. Co-counsel testified that she did not believe Hill's testimony, that the Petitioner's prints were not recovered at the scene, would have changed the outcome of the Petitioner's trial in light of the evidence against the Petitioner. Co-counsel testified that, after the victim's

testimony at trial, the Petitioner told her that the victim "was prejudiced because [the Petitioner] shot him."

*Davis v. State*, 2011 WL 6323016, at *3-7.

Following the petition hearing, the Shelby County Criminal Court denied Davis's petition by order dated June 30, 2010.   (Order Denying Pet. for Post-Conviction Relief, *id*. at Page ID 888-97.)

On July 2, 2010, Davis through counsel Robert Brooks[5] appealed the denial of his petition for post-conviction relief to the Tennessee Court of Criminal Appeals.   (Not. of Appeal for Pet. for Post-Conviction Relief, *id*. at Page ID 900.)   Davis's raised two issues in his appeal:

1. Whether counsel was ineffective for failing to argue that the identification procedure employed was unduly suggestive in that, in a case involving the robbery of a jewelry store, the defendant was the only person in the photo lineup that was wearing any kind of jewelry.

2. Whether counsel was ineffective for failing to argue that the convictions for both attempted first-degree murder and especially aggravated robbery violated the "same evidence" test.

(*Id.*, Page ID 1600, ECF No. 11-14.)   The Tennessee Court of Criminal Appeals affirmed the decision of the Shelby County Criminal Court.   *Davis v. State*, No. W2010-01607-CCA-R3PC, 2011 WL 6323016, at *3-7 (Tenn. Crim. App. Dec. 16, 2011), *appeal denied* (Tenn. Apr. 19, 2012).

## II.   § 2254 Petition

Davis filed his *pro se* § 2254 Petition on January 5, 2013.   (§ 2254 Pet., *Davis v. Sexton*, ECF No. 1.)   On January 15, 2013, the Court entered an order (ECF No. 2) directing Davis to properly file an *in forma pauperis* affidavit or pay the five dollar ($5) filing fee.   Davis filed his

_____

[5] On August 2, 2010, the court entered an order substituting Brooks for Kamilah Turner to represent Davis in his post-conviction proceedings.   (*Id.* at Page ID 887.)

IFP motion (ECF No. 4) January 31, 2013, which the Court granted February 19, 2013 (ECF No. 5.) The Court directed Respondent to file a response to the petition April 24, 2013 (ECF No. 8.), and Respondent filed his answer (ECF No. 10) and the complete state record (ECF No. 11) on May 17, 2013. On June 11, 2013, Davis filed a reply (ECF No. 12) to the answer. The Court subsequently granted Respondent leave to file a sur-reply, which was filed on August 5, 2013 (ECF No. 15).

On August 15, 2013, Davis filed a motion for leave to amend his § 2254 petition (ECF No. 17) and a reply to Respondent's sur-reply (ECF No. 16). On August 30, 2013, Respondent filed his opposition to the motion to amend (ECF No. 18), arguing that the motion was "deficient because he has not included the proposed amended petition with his motion and thereby makes it impossible to determine how he intends to amend it and whether such amendments would be futile." Davis filed the amended § 2254 petition (ECF No. 19) on August 27, 2013.[6] On September 10, 2013, Respondent filed an amended response (ECF No. 20) to Davis's motion to amend, withdrawing his opposition but without waiving "any procedural or affirmative defenses that may apply to any of the claims arrested in the amended petition."[7] The Court granted Davis's motion for leave to amend his § 2254 petition on December 10, 2013 (ECF No. 22). Respondent filed its answer (ECF No. 23) to the Amended § 2254 Petition and argued that the Court should

---

[6] The Clerk received Davis's amended § 2254 petition on September 3, 2013. (*See* Attachment, Mot. to Am., ECF No. 19.) However, the record shows that Davis placed the amended petition in the prison mailing system on August 27, 2013. (*See* ECF No. 19.) A petition is deemed to have been filed when the prisoner "deliver[s] the [submission] to prison authorities for forwarding to the District Court." *Houston v. Lack*, 487 U.S. 266, 270 (1988).

[7] On September 10, 2013, Davis filed a response (ECF No. 21) addressing Respondent's withdrawal of opposition to the motion amend, arguing that Respondent's response was moot and that his "Amended Petition does not contain any procedurally defaulted grounds and all of the grounds presented therein were fairly presented to the State court."

dismiss Davis's amended petition with prejudice because his claims were either procedurally defaulted, time-barred, or meritless.

## III. DAVIS'S FEDERAL HABEAS CLAIMS

In his § 2254 Petition, as amended, Davis raises the following claims:

1. Whether the trial court erred in overruling Petitioner's [m]otion to suppress the victim's identification testimony[.]

2. Whether the trial court erred by denying Petitioner's request for a special jury instruction[.]

3. Whether the trial court committed plain error in its instruction of the definition of "knowingly[.]"

4. Whether Petitioner was denied reasonably effective assistance of trial and/or appellate[8] counsel, when his counsel did not:

    a. Sufficiently argue in a motion to suppress hearing that the out of court identification made [by] Gary Smallwood ("Victim") should have been suppressed;

    b. Investigate latent fingerprint evidence that was recovered from the crime scene;

    c. [A]rgue that the convictions for both attempted first-degree murder and especially aggravated robbery violated the "same evidence" test;

    d. [S]eek dismissal of the especially aggravated robbery indictment because it fail[ed] to charge the alleged offense, which makes such indictment void;

    e. Subpoena Victim's medical records in hopes of impeaching his credibility;

    f. Request a jury instruction on the lesser included offense of aggravated robbery;

---

[8] Although Davis asserts in his original § 2254 petition that he was "denied effective assistance of trial and appellate counsel," Davis only argues claims of ineffective assistance of trial counsel throughout his petition. (ECF Nos. 1, 19.)

g.  Adequately investigate prior to Petitioner's trial;

h.  Prepare a reasonable defense;

i.  Seek dismissal of indictment for attempted first degree murder.

### STANDARD OF REVIEW

Federal courts have the statutory authority to grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

**I. Exhaustion and Procedural Default**

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal court to the state courts.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  The petitioner must "fairly present"[9] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 837, 847-48 (1999).  Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to

---

[9] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam).  Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

"be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (noting that the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes the court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted but procedurally barred. *Coleman*, 501 U.S. at 732; *see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Coleman*,

501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## II. Standard for Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).[10]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181. A state court's decision is

---

[10] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

"contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).[11] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13. Under this ground for relief, the state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411.

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[12] "Notwithstanding the presumption

---

[11] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

[12] In *Wood*, the Supreme Court granted certiorari to resolve the question of whether a petitioner must satisfy § 2254(d)(2) by establishing only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and

of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## III. Ineffective Assistance of Counsel Standard

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686. To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' *Id.* at 687." *Harrington*, 562 U.S. at 104.

---

convincing evidence. 668 U.S. at 293, 299. The Supreme Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, the Supreme Court recognized that whether § 2254(e)(1) was inapplicable to some factual disputes remained an open question. 546 U.S. at 339.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[13] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Strickland*] at 693. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.* at 687." *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687, 693); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to rule out [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.")

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Federal courts must show caution when evaluating ineffective assistance claims under § 2254(d), because "when § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

<u>**ANALYSIS**</u>

**I. Claim 1: Trial Court Error in Overruling Davis' Motion to Suppress**

In claim 1, Davis argues that the trial court erred when it overruled his motion to suppress

---

[13]"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

and allowed Gary Smallwood's identification testimony. Specifically, Davis argues that "[t]he totality of the circumstances surrounding the photographic line-up, with the victim in the intensive care unit of the hospital unable to speak and asked by [Sergeant] Clark if he understood he might die, was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." (§ 2254 Pet., Page ID 5, ECF No. 1.) Respondent argues that the Court should dismiss Claim 1 because the TCCA rejected this claim and the TCCA's decision was not contrary to or an unreasonable application of *Neil v. Biggers*, 409 U.S. 188 (1972). Respondent avers that even if this Court were to find that the photographic line-up was unduly suggestive, "the identification . . . showed the indicia of reliability to warrant its admissibility under *Biggers*, and the state court reasonably applied *Biggers* in this instance." In his reply, Davis acknowledges that the trial court properly identified the applicable governing principle in *Biggers* but argues that the court unreasonably applied *Biggers* to the facts of his case in violation of his Fifth Amendment rights.

The Court holds that Davis has not met his burden of demonstrating that the TCCA's decision was an unreasonable application of *Biggers* or was based on an unreasonable factual determination. In denying Davis's motion to suppress the identification testimony, the trial court found that the photographic lineup and the identification procedure were not unduly suggestive and did not lead to the misidentification of Davis as the suspect in this case. In his direct appeal, Davis argued that the photographic lineup was unduly suggestive under *Neil v. Biggers*. The TCCA cited the correct, five factor test from *Biggers* and affirmed the trial court's conclusion that the identification was not unduly suggestive. The TCCA supported its holding with a thorough review of the testimony received by the trial court at the suppression hearing. The TCCA set out

the testimony of Sergeant Clark about the compilation of the photographic spreadsheet with Davis's photograph and the process Sergeant Clark used to communicate with Smallwood who was still in intensive care.   The TCCA went on to describe the trial testimony given by Sergeant Clark, Smallwood, and Smallwood's business partner Mike Turberville, who was present in the hospital room during Smallwood's identification, all tending to show that Smallwood identified Davis without any improper suggestion from the police.   The TCCA addressed each of Davis's arguments to undermine the trial court's credibility determination.   *State v. Davis,* 2003 WL 21339000, at *3-6. In sum, the TCCA carefully considered the record evidence and held that the trial court had committed no error in its application of Biggers or its denial of the motion to suppress.

After reviewing the trial court's findings and the testimony of Sergeant Clark (*see* Trial Tr., *State v. Davis*, Page ID 264-91, ECF No. 11) and Gary Smallwood (*see* Trial Tr., *id.* at Page ID 210-49), in light of the *Biggers* factors, it is evident that the TCCA properly determined that Smallwood's identification was reliable because the photographic lineup was not unduly suggestive.   The TCCA appropriately identified three factors that directly support its determination: (1) the identification procedure itself was not unduly suggestion; (2) other suspects in the photographic lineup had physical characteristics and features similar to Davis's; and (3) the victim identified Davis without assistance, prompting, or hesitation.   A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary.   28 U.S.C. §§ 2254(d)(2), 2254(e)(1).   Davis has not shown with argument or evidence to refute the presumption of correctness accorded the state court's

determination. Therefore, the Court concludes that claim 1 is without merit and is therefore **DISMISSED** with prejudice.

## II. Claim 2 and 3: Davis Procedurally Defaulted His Objections to the Jury Instructions

Davis next claims in his § 2254 petition concern the trial court's instructions to the jury. In claim 2, Davis argues that the trial court erred in denying his request for special jury instructions. In claim 3, Davis argues that the trial court committed plain error in defining the term "knowingly" in the jury charge on especially aggravated robbery and attempted first degree murder charges. In his answer, Respondent argues that both claims should be dismissed as procedurally defaulted and as non-cognizable issues for federal habeas review. Specifically, Respondent avers that claims 2 and 3 should be dismissed because "an independent and adequate state-law ground prevents [Davis] from properly exhausting the claims as required under 28 U.S.C. § 2254(b)(2)." (Ans., Page ID 64, ECF No. 10) (referencing *Coleman*, 501 U.S. at 749). Respondent also argues that "the jury-instruction arguments do not contain any specific federal theory of constitutional violation and do not even make a passing reference to due process." (*Id.*)

In his reply, Davis concedes that "certain violations that occurred stand on independent and adequate state grounds" and that they should be barred from review by the Court. (Reply, Page ID 1689, ECF No. 12.) But Davis goes further to state that "the grounds that violate the 6[th] Amendment to the United States [sic], namely . . . a fair jury trial . . . are properly preserved and exhausted and ripe for review." (*Id.*) Davis argues that his jury instruction claims are cognizable because they invoke violations of the Sixth Amendment of the United States Constitution. Davis also argues that he properly exhausted these claims in state court and that they were both presented to the highest state court in Tennessee.

Davis presented claims 2 and 3 on direct appeal to the TCCA. (*See* Br. of Appellant on Direct Appeal, *State v. Davis*, Page ID 722, ECF No. 11-9.) The TCCA determined both claims on their merits and denied them. See *State v. Davis*, 2003 WL 21339000, at *6-10. However, pursuant to 28 U.S.C. § 2254(a), a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Davis does not assert any violation of the United States Constitution or the laws or treaties of the United States in his arguments for claims 2 and 3, either in his original § 2254 petition or in his amended § 2254 petition.

Additionally, Davis did not raise any federal constitutional issues in his direct appeal challenging the trial court's error regarding the jury instructions. In his direct appeal for Claim 2, Davis argued that the denial of his special instruction implicated the trial court's duty under Tennessee law to give "a complete charge on the law applicable to the facts of a case" and the he was entitled as a matter of Tennessee constitutional law to a complete and correct instruction. (Br. of Appellant on Direct Appeal, *id.*, Page ID 741, ECF No. 11-9.) In his direct appeal for Claim 3, Davis argued that the trial court's definition of "knowing" was inconsistent with Tennessee law. (Br. of Appellant on Direct Appeal, *id.*, Page ID 744, ECF No. 11-9.) In its opinion in the direct appeal, the TCCA examined at some length the trial court's decision on claims 2 and 3 as questions of state law and upheld the trial court's decision by relying on

Tennessee constitutional law. *State v. Davis*, 2003 WL 21339000, at *6-10. With respect to claim 2 and Davis's request for a special instruction, the TCCA held that "the trial court's instructions contained adequate and proper statements of the law" in Tennessee and "that the trial court did not err in refusing to submit the special instruction requested by the defendant." *Id.* at *9. With respect to claim 3 and Davis's challenge to the instructions' definition of "knowingly," the TCCA held that any error in the trial court's jury charge was harmless under Tennessee Rule of Criminal Procedure 52. *Id.* at *9-10. And as for the trial judge's definition of the "knowing" mens rea for the crime of aggravated robbery, the TCCA held any error harmless in light of the fact that the issue at trial was Davis's identity, not his intent. *Id.* at *10. Although Davis raises a federal constitutional issue in his reply brief, his late addition of a Sixth Amendment violation to his § 2254 Petition cannot cure his default. As the TCCA's opinion makes clear, Davis failed to exhaust the Sixth Amendment violation issue in state court. Because there are no longer any means by which to do so, these issues are barred by procedural default. Therefore, the Court holds that claims 2 and 3 are procedurally defaulted and are therefore **DISMISSED** with prejudice.

### III. Claim 4(a): Ineffective Assistance of Trial Counsel and Photographic Lineup

In Claim 4(a), Davis contends he was denied effective assistance of trial counsel because his attorneys failed to argue that the photographic lineup procedure was unduly suggestive. (*See* § 2254 Pet., *id.*, Page ID 16, ECF No. 1; *see also* Am. § 2254 Pet., *id.*, Page ID 1751, ECF No. 19.) Specifically, Davis contends that trial counsel's failure to raise the issue where the photo-spread contained only one slim man (Davis is slim) and only one man "wearing any jewelry was more than merely unduly suggestive" and "was tantamount to hanging a sign around [Davis]'s neck

saying 'this is the one" violated due process. (§ 2254 Pet., *id*., Page ID 17-18, ECF No. 1.)

According to Davis, trial counsel did not challenge the method of the identification procedure itself, only the circumstances of the procedure and the way it was presented to the victim. (*See id.* at Page ID 17.) Respondent answers that the Court should dismiss Davis's ineffective assistance of counsel claim because the TCCA's decision was not contrary to, or an unreasonable application of, *Strickland v. Washington*. Respondent argues that "[t]he state court reasonably decided, after reviewing the petitioner's argument, that the pre-trial identification was not impermissibly suggestive; therefore, the petitioner's counsel was reasonable for coming to the same conclusion." (Am. Ans., *id*., Page ID 1800-01, ECF No. 23.) Thus, if even the TCCA were to find trial counsel ineffective, Davis suffered no prejudice.

In his appeal of the trial court's denial of his petition for post-conviction relief, Davis raised the same issue, namely, "whether counsel was ineffective for failing to argue that the identification procedure employed was unduly suggestive in that, in a case involving the robbery of a jewelry store, the defendant was the only person in the photo lineup that as wearing any kind of jewelry." (Br. of Appellant on Appeal for Pet. for Post-Conviction Relief, *Davis v. State*, Page ID 1600, ECF No. 11-14.) The TCCA first analyzed the standard for the IAC claim under *Strickland* and proceeded to affirm the trial court's rejection of the claim. The TCCA noted that the trial court had denied Davis's motion to suppress the identification, the TCCA had affirmed that ruling in the direct appeal, and the trial court had rejected Davis's IAC claim for failure to object to the photospread. The TCCA concluded that Davis's attorneys were "not ineffective for failing to argue that the line up itself was unduly suggestive." *Davis v. State*, 2011 WL 6323016, at *9-10. Even assuming that the photospread was unduly suggestive, the TCCA held that Davis

could not establish prejudice. Smallwood identified Davis from the stand during the trial. Davis's co-defendant also made a statement indicating that Davis was the shooter, and Davis himself had confessed to the crime. *Id.* at *10. In his § 2254 petition, as amended, Davis now contends that the TCCA unreasonably applied *Strickland*.

The Court holds that the decision of the TCCA was a run-of-the-mill decision applying the holding of *Strickland* to the facts of the case and was not contrary to *Strickland*. Davis has not met his burden of demonstrating that the TCCA's decision was an unreasonable application of *Strickland* or was based on an unreasonable factual determination. The TCCA directly cited and applied *Strickland*'s two-prong test to Davis' ineffective assistance of counsel claim before finding that Davis was not entitled to relief. And even though Davis claims there is a "reasonable probability" the outcome of his trial would have been different if he had not been prejudiced by his trial counsel's error, Davis has not and cannot demonstrate any prejudice from counsel's performance at trial. For the reasons already explained, the photographic lineup was not unduly suggestive. At the post-conviction hearing, Davis' trial counsel, William Massey, was questioned about the photographic lineup. The following exchange occurred during Massey's direct examination:

> Q.    . . . Now, with regard to the photo identification of Mr. Davis by Gary Smallwood, the victim, it was known that this identification was made while Mr. Smallwood was in the hospital in an intensive care unit and under some strenuous conditions, a respirator. It's in the record.
>
> A.    The initial – the initial identification from the lineup identification, the photo lineup, photo array.
>
> . . . .

A.     I don't think [Smallwood's medical records] were subpoenaed to the trial. I don't remember subpoenaing them to the trial. And I don't — I don't recall that being an issue at the Suppression Hearing.

Q.     His ability to identify someone in the photo?

A.     I think you put your finger right on it there, Ms. Turner, it's his ability to identify. It's not a question of legal admissibility. It's a question of weight that the jury is going to give that testimony that Mr. Smallwood is going to give. And he was cross-examined about all those things and there was – he was cross-examined at trial. I don't remember the suppression cause I don't think I was there, but it was brought out for the jury to fairly weigh whether or not Mr. Smallwood could identify, was accurate in his identification of Mr. Davis. There was also in addition to his identification, I think it was Mr. Smallwood that noted that when he had seen him before he was in a white Crown Victoria car. I believe that's the type it was. And sure enough, they – Mr. Davis has a Crown Victoria car. . . .

(Pet. for Post-Conviction Hr'g Tr., *Davis v. State*, Page ID 1003-05, ECF No. 11-11.)

The Court finds no evidence in this exchange or anywhere else in the record of the post-conviction proceedings that Davis' counsel's performance was deficient or prejudicial. Based on the evidence presented at the post-conviction hearing, the TCCA determined that Davis was not entitled to post-conviction relief because he failed the overcome the presumption that trial counsel's performance was sound trial strategy. Davis has not satisfied his burden of showing that the TCCA's decision was objectively unreasonable. A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1). Again David has not provided any argument or evidence that refutes the presumption of correctness accorded the state court's determination. Based on this Court's review of the record and the TCCA's analysis of the ineffective assistance of counsel claim, Claim 4(a) is without merit and is **DISMISSED** with prejudice.

**IV. Claim 4(c): Ineffective Assistance of Trial Counsel and "Same Evidence" Test**

In Claim 4(c), Davis argues that his trial counsel rendered ineffective assistance of counsel for failing to argue that his convictions for especially aggravated robbery and attempted second degree[14] murder violated the "same evidence" test and created a risk of double jeopardy. (§ 2254 Pet., *id.*, Page ID 20, ECF No. 1.) Davis contends that both of his convictions "arose out of a single criminal act on a single victim and both offenses served the same purpose, to deter assaultive conduct." (*Id.*) According to Davis then, the prosecution raises due process and double jeopardy concerns the only remedy for which was the reduction of the especially aggravated robbery count to aggravated robbery. Respondent argues that the TCCA's prior decision on this claim was not contrary to or an unreasonable application of *Strickland*. Respondent argues that "trial counsel could reasonably have concluded that the convictions did not violate double jeopardy and because there was no prejudice."

In his post-conviction relief appeal to the TCCA, Davis raised the issue of "whether counsel was ineffective for failing to argue the convictions for both first-degree murder and especially aggravated robbery violated the 'same evidence' test." (Br. of Appellant on Appeal for Pet. for Post-Conviction Relief, *Davis v. State*, Page ID 1614, ECF No. 11-14.) As with Davis's other IAC claims, the TCCA set out the correct standard under *Strickland* and denied Davis'

[14]In both his § 2254 Petition (see § 2254 Pet., Davis v. Sexton, Page ID 20, ECF No. 1) and on direct appeal (see Br. of Appellant on Appeal for Pet. for Post-Conviction Relief, *Davis v. State*, Page ID 1614, ECF No. 11-14), Davis argues the convictions for especially aggravated robbery and attempted first degree murder violated the "same evidence" test. However, as state above, *supra* p. 3, Davis was convicted of the lesser included offense of criminal attempt second degree murder.

claims on its merits.   The TCCA first held that Davis's prosecution for the two offenses presented no due process concerns because "a murder attempt is not always shown by proving an especially aggravated robbery" and "neither of [Davis]'s convictions are necessarily incidental to the other." 2011 WL 6323016, at *11.   As for Davis's double jeopardy claim, the TCCA engaged in the analysis required under *State v. Denton* and held that Davis's case did not offend double jeopardy. Each offense had separate elements, the proof required to establish each offense was distinct and consisted of discrete acts, and each offense served separate legislative purposes.  *Id.* at *12-13. Davis now argues in his § 2254 petition that his conviction violated double jeopardy and that a reasonable trial attorney would have raised the argument and that his attorneys' failure to do so prejudiced him.

Despite Davis's claim that a "reasonable probability" exists that he would have prevailed at trial if he had not been prejudiced by his trial counsel's errors, Davis has not and cannot demonstrate any prejudice from counsel's performance at trial.   Davis' ineffective assistance of counsel claim fails because the especially aggravated robbery charge and the criminal attempt first degree murder charge do not violate the Double Jeopardy Clause.   The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."   U.S. Const. Amend. V.   The prohibition against double jeopardy protects individuals not only from successive trials but also prohibits multiple punishments for the same offense."   *United States v. DeCarlo,* 434 F.3d 447, 454 (6th Cir. 2006).   "Generally, an indictment may not charge a single criminal offense in several counts without offending the rule against 'multiplicity' and implicating the double jeopardy clause."   *United States v. Richards,* 659 F.3d 527, 547 (6th Cir. 2011) (internal quotation marks omitted), *cert. denied,* 132 S. Ct. 2726 (2012).   "The first step in

deciding whether one act can give rise to more than one conviction under separate statutes, or separate sections of the same statute, is to determine 'whether Congress intended to punish each statutory violation separately.'" *DeCarlo,* 434 F.3d at 454 (quoting *Pandelli v. United States,* 635 F.2d 533, 536 (6th Cir. 1980). "A defendant may be convicted of multiple crimes arising from the same course of conduct so long as each charge 'requires proof of a fact which the other does not.'" *United States v. Kurlemann,* 736 F.3d 439, 452 (6th Cir. 2013) (quoting *Blockburger v. United States,* 284 U.S. 299, 304 (1932)); *see also United States v. Kelly,* 204 F.3d 652, 656 (6th Cir. 2000) ("A defendant may be charged with multiple offenses based on the same underlying conduct as long as each offense requires proof of an element not required by the other."). Thus, for example, the Court of Appeals has held that a district court did not err in denying a defendant's motion to dismiss two counts of an indictment as multiplicitous where the defendant transmitted child pornography through different websites. *Richards,* 659 F.3d at 549.

As Respondent correctly argues, claim 4(c) is meritless because "[a]ttempted second-degree murder and especially aggravated robbery entail at least one element not found in the other offense." (Ans., *id.*, Page ID 70, ECF No. 10.) The TCCA properly described the different elements for criminal attempt and especially aggravated robbery. It is true that the two offenses share some elements in common; however, both offenses include an element that is not found in the other. The TCCA's application of *Strickland* to the facts of this case was not contrary to law. More to the point, Davis has not satisfied his burden of showing that the TCCA's decision was objectively unreasonable. As a result, Davis has not met his burden of demonstrating that the TCCA's decision was an unreasonable application of *Strickland* or was based on an unreasonable factual determination. Based on this Court's review of the record and

the TCCA's analysis of the ineffective assistance of counsel claim, Claim 4(c) is without merit and is **DISMISSED** with prejudice.

## V. Claims 4(b) & 4(d): Procedural Default and *Martinez*

In Claim 4(b), Davis next argues that he was denied effective assistance of counsel because his trial counsel failed to investigate latent fingerprint evidence found at the crime scene. (*See* § 2254 Pet., *id*., Page ID 19, ECF No. 1; *See* Am. § 2254 Pet., *id*., Page ID 1751, ECF No. 19.) In Claim 4(d), Davis argues that he was denied effective assistance of counsel because his trial counsel failed to seek a dismissal of his especially aggravated robbery charge. (*See* § 2254 Pet., *id*., Page ID 21, ECF No. 1.) Respondent answers that Claims 4(b) and 4(d) are procedurally defaulted because Davis never presented either claim to the TCCA. In his Reply, Davis concedes that Claims 4(b) and 4(d) are procedurally defaulted but maintains that the default should be excused because of the Supreme Court decisions in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) and *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013) and the United States Court of Appeals for the Ninth Circuit's ("Ninth Circuit") decision in *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003). Davis contends that he notified his post-conviction counsel to amend his post-conviction petition to include Claims 4(b) and 4(d) but post-conviction counsel failed to add the additional claims.

In his sur-reply, Respondent argues that Davis's reliance on *Trevino*, 133 St. Ct. 1911, and, presumably its predecessor *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), is unavailing because *Martinez* does not apply to Tennessee cases. Respondent also argues that *McQuiggin v. Perkins*, 133 S. Ct. 124 does not apply in this case: (1) Respondent "has not asserted statute of limitations as a procedural defense in this action"; and (2) Davis has not provided any new evidence to support an actual innocence claim. Lastly, Respondent argues that Davis' reliance on the Ninth Circuit

opinion in *Alcala v. Woodford* is misplaced because "[*Alcala v. Woodford*] does not appear to address procedural default and, as a Ninth Circuit opinion, is in any case not binding upon this Court." The Court finds Respondent's argument regarding the applicability of *Alcala* to be well-taken and will not analyze Davis' ineffective assistance of counsel claims under *Alcala*.

The questions for the Court then with respect to claims 4(b) and 4(d) are two: (1) whether Davis procedurally defaulted the claims; and (2) if so, whether *Trevino*, *Martinez*, and *McQuiggin* excuse Davis's default. The Court considers these questions separately as to each claim.

A. Claim 4(b): Trial Counsel's Failure to Investigate Latent Fingerprints

In Claim 4(b), Davis specifically argued his IAC on the grounds that counsel did not have the garbage bag liner used by the robbers to collect the jewelry and later recovered by the police tested for fingerprints, "despite the fact the victim stated that the Petitioner handled such bag with his bear [sic] hands during such robbery." (§ 2254 Pet., *id.*, Page ID 19, ECF No. 1.) Davis supposes that the liners would not have contained his fingerprints and therefore supported his claim of actual innocence. Davis concedes here that he did not present this argument to the TCCA but argues that his procedural default should be excused. Davis claims his post-conviction counsel failed to raise this issue before the TCCA in his post-conviction appeal. The Court should consider the claim exhausted because of Davis's procedural default and lack of any remaining avenue to present the claim, given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of claim 4(b).

In order to survive this procedural defect, Davis must show cause for the Court to excuse his failure to present the claim on appeal by showing actual prejudice or by showing that a failure

to review his claims would result in a fundamental miscarriage of justice. To demonstrate a fundamental miscarriage of justice, Davis would have to show he is actually innocent of the crimes he was convicted of.

In this case Davis claims that he is actually innocent and that his procedural default should be excused pursuant to *McQuiggin.* "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *McQuiggin*, 133 S. Ct. at 1928; *see also id.* at 1930-31 (a credible showing of actual innocence works to "overcome" the statute of limitations rather than simply to excuse late filing). The Supreme Court has emphasized "that tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* at 1928 (quoting *Schlup v. Delo,* 513 U.S. 298, 329 (1995)). "There is a circuit split about whether the 'new' evidence required under *Schlup* includes only newly discovered evidence that was not available at the time of trial, or broadly encompasses all evidence that was not presented to the fact-finder during trial, *i.e.,* newly presented evidence." *Cleveland v. Bradshaw,* 693 F.3d 626, 633 (6th Cir. 2012). Although the Sixth Circuit has not decided the issue, its opinions "suggest[] that this Circuit considers 'newly presented' evidence sufficient." *Id.*

Davis does not claim to have discovered any new evidence demonstrating his actual innocence. Davis provides the same facts and evidence that he presented to the TCCA during his post-conviction petition hearing. As such, the Court is not persuaded that if trial counsel had investigated the fingerprints on the trash bag liner, then no reasonable juror would have found

Davis guilty of especially aggravated robbery or attempted second degree murder. Davis's claim of actual innocence is insufficient to overcome his procedural default. Therefore, Davis is not entitled to *McQuiggin* relief for Claim 4(b).

Davis also argues that he would be actually prejudiced if the Court does not excuse his procedural default because of the ineffectiveness of his post-conviction counsel. The Supreme Court has explained that even though ineffective assistance of counsel can be cause for a procedural default, the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986) (internal citation omitted). Davis did not avail himself of his post-conviction remedies to exhaust this claim of ineffective assistance by his trial attorney. "[A]ttorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which he was not constitutionally entitled to counsel, *e.g.* a discretionary appeal or state post-conviction proceeding." *See Coleman,* 501 U.S. at 751-53 (internal citations omitted). Davis has not established cause and prejudice for his procedural default and presents no tenable claim of factual innocence. Thus, he cannot avoid the procedural bar erected by the state post-conviction statute of limitations and cannot seek federal habeas relief on claim 4(b).

Moreover, "[t]here is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman,* 501 U.S. at 752 (internal citations omitted). Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's

agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted). Thus, where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.[15]

In 2012, the Supreme Court in *Martinez* recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 1320. *Martinez* established the following requirements to excuse a procedural default:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino*, 133 S. Ct. at 1918 (emphasis and revisions in the original).

---

[15]*See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

*Martinez* arose under an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal. *Id.* at 1313. In the Supreme Court's subsequent decision in *Trevino*, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in *Trevino* modified the fourth requirement stated by *Coleman* for overcoming a procedural default.

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *Sutton v. Carpenter*, 745 F. 3d at 787, 795-96 (6th Cir. 2014). To be "substantial" under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel. *Martinez*, 132 S. Ct. at 1318-1319.

*Martinez* elaborated on what it meant for a claim to be "substantial":

> When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, i.e., it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.

132 S. Ct. at 1319. *Martinez* requires that a petitioner's claim be rooted in "'a potentially legitimate claim of ineffective assistance of trial counsel.'" *Cook v. Ryan*, 688 F.3d 598, 610 (9th Cir. 2012) (quoting *Lopez v. Ryan*, 678 F.3d 1131, 1138 (9th Cir. 2012)), *cert. denied*, 133 S. Ct. 55 (2012). The petitioner must show a "substantial" claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. *McGuire v. Warden*, *Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 998 (2014). *See*

*Hoak v. Idaho*, No. 1:09–CV–00389–EJL, 2013 WL 5410108, at *7 (D. Idaho Sept. 25, 2013) ("*Martinez* requires the district court to review but not determine whether trial counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to determine only whether resolution of the merits of the claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them."); *see also Gunter v. Steward*, No. 2:13–CV–00010, 2014 WL 2645452, at *13 (M.D. Tenn. June 13, 2014) ("[I]n many habeas cases seeking to overcome procedural default under *Martinez,* it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*."). The Supreme Court and the Sixth Circuit have not provided guidance as to how district courts reviewing habeas petitions are to implement the rulings in *Martinez and Trevino*. *See id*. at *12.

Davis is not entitled to relief because he cannot meet the four factor test of *Martinez*. Specifically, Davis has not shown a substantial claim of ineffective assistance of trial counsel. Davis argues that his trial counsel rendered ineffective assistance of counsel by failing to properly investigate the latent fingerprints left at the crime scene. Davis has never presented this ineffective assistance of trial counsel claim before the TCCA. At the post-conviction hearing, Davis' post-conviction counsel, Kamilah Turner, questioned the latent fingerprint examiner for the Memphis Police Department, Jim Hill, who processed the crime scene in this case. (*See* Pet. for Post-Conviction Hr'g Tr., *Davis v. State*, Page ID 1032, ECF No. 11-12.) During his direct-examination, Hill testified that none of Davis' fingerprints were found at the crime scene. (*See id*. at Page ID 1033-46.) Hill also testified that he did not have any "personal knowledge"

about any fingerprints taken from a plastic bag from the crime scene.   (*Id*. at Page 1040.)

Turner questioned Davis' trial counsel, William Massey, on direct examination about his investigation of the latent fingerprints at the crime scene.   The following exchange occurred:

Q.    Now, you were aware through the discovery that there were possibly some fingerprints that were taken from the scene; correct?  Do you recall that? Is that something that was a part of your discussion [with Davis]?

A.    I mean, this was a jewelry store that was open to the public.  I would assume that there were fingerprints but I don't recall any particular thing about – help me.   Help me a little bit.   Maybe it will job my memory.

Q.    Well, would – yes.   Could you look at that exhibit, please?   It's about midways down where they mention the fingerprints.

A.    Okay.   It says prints of possible value were obtained and turned in at the Crime Scene Office.

Q.    Yes.   Now, you stated previously that you remember someone had taken a trash can out and –

A.    That was the testimony at trial.

Q.    That was the testimony.   Did you ever think that possible you should ask for these fingerprints to be compared with your client?   There were prints taken, so that if his fingerprints weren't there on some of the things that the victim says the robbers touched or handled, that could possibly be somehow exculpatory in the eyes of the jury?

A.    I guess it maybe could be, maybe.   But there's another side to that. Another edge to that blade.   First, I don't think they recovered – and I may be wrong but I don't believe so.   They didn't recover the lining from the trash can or anything like that that may have fingerprints on them. Secondly, the area – and it was nebulous or confusing in the report where they got the fingerprints – some fingerprints of value from.   I don't know if that was from the counter which would be open to the public or if it was from another location.   It just says some prints of value were gotten. But that being open to the public, that could of course be anybody's fingerprint.   Our defense was we weren't there.   Mr. Davis was going to testify that he wasn't there.   And he was trying to get us an alibi witness to show that he wasn't there.   I alert the State to fingerprints by request and the testing of it, I don't know if they tested them or not.   And it were [sic]

Theron Davis' fingerprints I assume the State would have used them. Now, I don't know. I don't know all of that. I don't know if they were – but it was in a public place where they were taken from. This was a business. So you would expect fingerprints to be on the door, the counter, in those various places. I didn't see that Mr. Davis would benefit that much from that. And what if they came back his? That would really shoot him down. I mean, what little he had to work with was him, Theron Davis, taking his personality and his ability to persuade and convincing that jury that Mr. Smallwood was incorrect. And Mr. Smallwood said he had seen him twice before. He had been in the place before. And that his confession to the police was the result of coercion. So we just – we just chose not to – to run with what we had and not . . .

(Pet. for Post-Conviction Relief Hr'g Tr., *Davis v. State*, Page ID 1000-03, ECF No. 11-11.)

Turner also questioned Davis's other trial attorney, Lorna McClusky, on direct examination, about her investigation of the latent fingerprints at the crime scene. The following exchange occurred:

Q.     Now, you received or you reviewed the discovery in this matter in preparation for trial correct?

A.     Yes, ma'am.

Q.     And were you aware that fingerprints had been lifted from the crime scene?

A.     Well, but I don't know whose they were until - -

Q.     Right, but you were aware that there was fingerprint evidence?

A.     Yes.

Q.     Did you attempt to contact anyone at the latent print office or anyone related to processing prints to determine what the outcome of those print tests were?

A.     No.

Q.     And why not?

A.     Well, our client had said he had been in there; and I certainly would not be surprised if his prints were there because he had said he had been in there.

41

And, also, if he's told me he's been in there, then I'm assuming that there's good chance his prints would be in there. You know, his position was he had been in there previously; and it wouldn't surprise us, at all, if his prints were there. I would not have gone through the trouble of getting that because if we had gotten the print work done, and if his fingerprints had been there; and there was a likelihood they would have been because he's told us he was there; that just puts another piece of evidence for the state to put on the table. So, since he says he's been there previously, there's a good chance they would find his prints there, and that wouldn't necessarily be helpful, we didn't look into that.

Q.     Okay. And in reviewing the discovery, did you notice that a garbage bag from the crime scene was located one day after?

A.     There was something about a garbage bag. Is that the one that was found at his house with the trays – around the corner from the trays? – is that where it was found? – around the corner?

Q.     No. Let me elaborate –

A.     There were jewelry trays in a bag. I think the trays were found around the corner from his house. I can't remember where the bag was.

Q.     Would it refresh your recollection if I showed you some of the discovery – the police report that was in Mr. Davis' discovery?

A.     It might – um-hum.

(There was a pause in the proceedings.)

A.     There was a bag found – um, hum – apparently – according to this.

Q.     Um—hum. Now, did you request that prints from this bag be compared with Mr. Davis?

MS. MCENDREE:[16]                    Judge, objection. That assumes facts not in evidence – foundation – were there prints lifted before –

MS. TURNER:          Okay.

---

[16Assistant District Attorney General Stacy McEndree represented the State of Tennessee during the post-conviction hearing.]

Q.      Ms. McClusky, upon reading this, does it appear that this was a bag that was related to the robbery on 12/28?

(There was a pause in the proceedings.)

A.      This bag – let me make sure – yeah – I would think so, yes, because the jewelry – um, hum – apparently – yeah – some more trays are being found.

Q.      And did you make a request that prints from this bag be taken and compared with Mr. Davis?

MS. MCENDREE:      Same objection, Judge.   First question being, "Were prints taken before they be requested to be compared."

MS. TURNER:      Your Honor, I believe my question was clear.   I'm asking if she asked that be prints be taken from the bag and compared with those of Mr. Davis.   If the witness doesn't understand the question, she can ask for clarity.

THE COURT:      That seems pretty straightforward.

A.      I did not – if I understand you correctly, we did not have the bag dusted, and we did not pursue prints on the bag.

Q.      Okay.   And Mr. Davis had stated to you that he was not involved in the robbery, correct?

A.      Yes.

. . . .

Q.      But he has stated that he was not involved in the robbery of the jewelry store?

A.      That was the position at trial, yes.   Yes.

Q.      And there was a bag found with items that appeared to be from the jewelry store trays – and jewelry – and you made a decision not to have this bag dusted for prints, correct?

A.      I would assume so, um—hum – yeah.

Q.      Would you think that it would be logical that the person who took the bag from the jewelry store would have – could have left prints on the bag?

43

| A. | Are you asking me just to guess? |
|---|---|
| Q. | Just in your trial preparation and in your trial strategy when you became knowledgeable of this information, did it make you think that possibly the person involved in the robbery could have prints on this bag? |
| A. | I honestly don't recall what it made me think. I mean, it refreshes my memory that, yes, there was a bag somewhere involved in this case. Now, there could have been another bag that I'm thinking about; but we didn't get the prints made; and that's about all I can tell you. |

(Pet. for Post-Conviction Relief Hr'g Tr., *Davis v. State*, Page ID 1049-53, ECF No. 11-12.)

It is evident from the post-conviction hearing transcript that trial counsel used appropriate trial strategy in determining whether to investigate the latent fingerprint evidence. Davis has not presented any credible proof from which the Court can conclude trial counsel performed deficiently and, as a result, Davis was prejudiced. Davis is not entitled to *Martinez* or *Trevino* relief for Claim 4(b). Therefore, Claim 4(b) is barred by Davis's procedural default and **DISMISSED** with prejudice.

## B. Claim 4(d): Trial Counsel's Failure to Seek Dismissal of Especially Aggravated Robbery Indictment

In Claim 4(d), Davis argues counsel was ineffective for failure to seek dismissal of the especially aggravated robbery count where the indictment did not allege that the property was taken against the victim's will or effective consent. Just as with his IAC claim concerning the fingerprints, Davis concedes that he did not present this argument to the TCCA. Davis instead argues that the Court should excuse his procedural default because his post-conviction counsel failed to raise this issue to the TCCA in his post-conviction appeal. Davis' claim is considered to be exhausted because of his procedural default, and he has no avenue remaining for presentation of the claim given the state statute of limitations on state post-conviction relief. This procedural

default operates as a complete and independent procedural bar to federal habeas review of Claim 4(d).

As stated above, Davis must show that he is actually innocent of the crime he is convicted of or that he has been actually prejudiced by the failure to raise this ineffective assistance of trial counsel claim. Davis argues that he is actually innocent and that his procedural default should be excused pursuant to *McQuiggin*. However, he does not claim to have discovered new evidence demonstrating his actual innocence. In fact, Davis does not provide any evidence for this Court to determine whether a fundamental miscarriage of justice would result from the failing to review this claim. Therefore, Davis' claim of actual innocence is unfounded and insufficient to overcome his procedure default. Davis is not entitled to *McQuiggin* relief for Claim 4(d).

Davis also argues that he would be actually prejudiced if his procedural default was not excused because of the ineffectiveness of his post-conviction counsel. (*See* Pet'r's Reply to Surreply, *Davis v. Sexton*, Page ID 1734, ECF No. 16.) Similar to its analysis above of claim 4(d), the Court finds that Davis is not entitled to relief because he cannot meet the four factor test of *Martinez*. Specifically, Davis has not shown a substantial claim of ineffective assistance of trial counsel. Davis argues that his trial counsel rendered ineffective assistance of counsel by failing to seek a dismissal of the especially aggravated robbery indictment. The indictment for the especially aggravated robbery charge states:

> The GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn
> and charged to inquire for the body of the county of Shelby County, Tennessee,
> upon their oath, present that:
>
> THERON DAVIS
> HERMAN SPENCER

on December 28, 1999 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully, knowingly, and violently, by use of a deadly weapon, to wit: a handgun, obtain from the person of Gary Smallwood, numerous items of jewelry, all of which was over the value of $1,000, but under the value of $10,000, proper goods and chattels of Gary Smallwood, and cause seriously bodily injury to the said Gary Smallwood, in violation of T.C.A. 39-13-403, against the peace and dignity of the State of Tennessee.

(Indictment, *State v. Davis*, Page ID 80, ECF No. 11-1.)

During the post-conviction hearing, Davis's attorney questioned Davis's trial counsel about his failure to seek a dismissal of the especially aggravated robbery indictment. The court interrupted Turner's questioning and the following exchange took place:

THE COURT:      Ms. Turner, I looked at that indictment. What do you allege is wrong with that indictment?

MS. TURNER:      That it does not state that the goods were taken without the owner's effective consent and that is an essential element of the offense. And because that is not specifically stated in this indictment –

. . . .

THE COURT:      Yeah, I think it's really irrelevant but we can make it as an exhibit. It does say violently in there.

MR. MASSEY:      It says unlawfully, knowingly, and violently with a deadly weapon, to wit, a handgun obtain from Gary Smallwood –

THE COURT:      Cause serious bodily injury. So I think that's – it's just – I don't know. I don't think that needed to be alleged. I think that goes without saying.

(Pet. for Post-Conviction Relief Hr'g Tr., *Davis v. State*, Page ID 1008-09, ECF No. 11-11.)

The trial court's exchange with Turner demonstrates that Davis' claim of ineffective assistance of trial counsel is not only meritless but trivial. The language in the indictment more than sufficiently establishes that the jewelry was taken without Smallwood's consent. Davis has

46

not presented any credible proof from which this Court may conclude that trial counsel performed deficiently and, as a result, Davis was prejudiced. Davis is not entitled to *Martinez* or *Trevino* relief for Claim 4(d). Therefore, claim 4(d) is barred by Davis's procedural default and **DISMISSED** with prejudice.

## VI. Claims 4(e)-(i): One-Year Statute of Limitations and Relation Back

Finally, Respondent acknowledges that Davis' original § 2254 petition was timely filed but argues that Claims 4(e)-(i) of Davis' amended § 2254 petition should be dismissed as time-barred. The claims asserted for the first time in the amended petition were filed after the one-year statute of limitations period and do not relate back to the original petition.

Twenty-eight U.S.C. § 2244(d) provides:

(1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall begin to run from the latest of—

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is

pending shall not be counted toward any period of limitation under this
subsection.

State convictions ordinarily become "final" within the meaning of § 2244(d)(1)(A) when the time expires for filing a petition for a writ of certiorari from a decision of the highest court on direct appeal. *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000). The TCCA issued its decision on direct appeal on May 28, 2003, and the Tennessee Supreme Court denied his application for permission to appeal on October 6, 2003. Davis' conviction became final on January 5, 2004, the last date for filing a petition for writ of certiorari with the United States Supreme Court, at which time the running of the limitations period commenced. The limitations period was tolled, pursuant to 28 U.S.C. § 2244(d)(2), when Davis filed his post-conviction petition on December 21, 2003. The TCCA affirmed the dismissal of the post-conviction petition on August 2, 2011, and the Tennessee Supreme Court denied his application for permission to appeal on April 19, 2012. The running of the limitations period recommenced at that time and expired on April 19, 2013.[17]

Davis timely filed his original § 2254 petition on January 5, 2013. Davis did not file his amended § 2254 petition until August 27, 2013, or 131 days after the running of the statute of limitations expired. The Court concludes then that claims 4(e)-(i) are time-barred unless claims 4(e)-(i) relate back to Davis' original § 2254 petition. The Supreme Court has held that "[a]n

---

[17] The statute of limitations period is not further tolled for a petitioner to seek writ of certiorari with the United States Supreme Court for a state post-conviction petition. *See Lawrence v. Florida*, 549 U.S. 327, 332 ("[The United States Supreme Court] is not a part of a 'State's post-conviction procedures.' State review ends when the state courts have finally resolved an application for state postconviction relief. . . . The application for state postconviction review is therefore not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of petition for certiorari.")

amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005); *see also Pinchon v. Myers*, 615 F.3d 631, 642 (6th Cir. 2010). However, "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle*, 545 U.S. at 664.

In his original § 2254 petition, Davis raised the following ineffective assistance of counsel claims:

> 4(a)    Trial counsel performed deficiently by failing to argue that the identification procedure employed was unduly suggestive in that, in a case involving the robbery of a jewelry store, the petitioner was the only person in the photo line-up that was wearing any kind of jewelry. (*See* § 2254 Pet., *Davis v. Sexton*, Page ID 16, ECF No. 1.)

> 4(b)    Trial counsel provided ineffective assistance by failing to investigate or obtain latent fingerprint evidence relative to the robbery. (*See id.* at Page ID 19.)

> 4(c)    Trial counsel provided ineffective assistance by failing to argue that the convictions for both attempted first-degree murder and especially aggravated robbery violated the "same evidence" test. (*See id.* at Page ID 20.)

> 4(d)    Trial counsel provided ineffective assistance by failing to seek dismissal of the especially aggravated robbery indictment because it fails to charge the alleged offense, which makes such indictment void. (*See id.* at Page ID 21.)

In his Amended § 2254 Petition, Davis raises five additional IAC claims:

> 4(e)    Whether he was denied effective assistance of trial counsel because his counsel failed to "[s]ubpoena Victim's medical records in hopes of impeaching his credibility." (Am. § 2254 Pet., *id.*, Page ID 1751, ECF No. 19.)

49

4(f)    Whether he was denied effective assistance of trial counsel because his counsel failed to "[r]equest a jury instruction on the lesser included offense of aggravated robbery." (*Id.*)

4(g)    Whether he was denied effective assistance of trial counsel because his counsel failed to "[a]dequately investigate prior to Petitioner's trial." (*Id.*)

4(h)    Whether he was denied effective assistance of trial counsel because his counsel failed to "[p]repare a reasonable defense." (*Id.*)

4(i)    Whether he was denied effective assistance of trial counsel because his counsel failed to [s]eek dismissal of indictment for attempted first degree murder." (*Id.*)

Claims 4(e)-(i) are time-barred because they are not tied to a common core of operative facts with the ineffective assistance of counsel claims stated in Davis's original § 2254 petition. Claims 4(e) and (f) present two entirely new claims that do not relate back to the original petition. Claims 4(g) and (h) relate so vaguely to Davis' original claims of ineffective assistance of counsel that these claims are too tenuously tied to a common set of operative facts that relate back to Davis' original § 2254 petition. In claim 4(d), Davis argues that his trial counsel was ineffective for failing to seek dismissal of his especially aggravated robbery indictment. In claim 4(i), Davis argues that his trial counsel was ineffective for failing to seek dismissal of his attempted first degree murder indictment. Although the indictments are supported from the same facts presented at trial, claim 4(i) differs in the offense elements needed to present the claim before the Court.

In the amendment to his initial petition, Davis does not seek to present additional legal authority, argument, or explication of the four ineffective assistance of trial counsel claims in his original § 2254 petition. He seeks to present five entirely new claims. Claims 4(e)-(i) do not relate back to the original petition. Therefore, the Court dismisses claims 4(e)-(i) as time-barred.

Even if this Court were to find that Davis' claims were not time-barred, Claims 4(e)-(i) would be dismissed as procedurally defaulted because none of these claims were presented to the

TCCA for review. Claims 4(e)-(i) are considered to be exhausted because of his procedural default, and he has no avenue remaining for presentation of the claim given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of claims 4(e)-(i). In order to survive this procedural defect, Davis would have to show cause that he should be excused from failing to present these claims on appeal by showing actual prejudice or by showing that a failure to review his claims would result in a fundamental miscarriage of justice. Davis does not argue either grounds. Therefore, claims 4(e)-(i) are **DISMISSED** with prejudice.

## I.      CONCLUSION

Because all issues raised by Davis are either barred by the doctrines of exhaustion and procedural default or are without merit, the petition is **DISMISSED** with prejudice. Judgment shall be entered for Respondent.

## II.     APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & 3. A "substantial showing" is made when the petitioner

demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773 (quoting *Slack*, 537 U.S. at 337).

In this case, there can be no question that the claims in this petition are barred by procedural default or are without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

For the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[18]

**IT IS SO ORDERED**, this 10[th] day of August, 2016.

s/ **S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[18] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).